# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 97-192

VIRGINIA D. TRILLES, APPELLANT,

V.

TOGO D. WEST, JR.,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Decided   February 15, 2000    )

*Michael P. Horan* and *Karen B. Levin*, of Washington, D.C., were on the pleadings for the appellant.

*Robert E. Coy*, Acting General Counsel; *Ron Garvin*, Assistant General Counsel; *Joan E. Moriarty* and *Mary Ann Flynn*, Deputy Assistant General Counsels; and *Amy S. Gordon* and *Gregory W. Fortsch*, of Washington, D.C., were on the pleadings for the appellee.

Before NEBEKER, *Chief Judge*, and KRAMER, FARLEY, HOLDAWAY, IVERS, STEINBERG, and GREENE, *Judges*.

GREENE, *Judge*, filed the opinion of the Court. KRAMER and STEINBERG, *Judges*, filed a concurring opinion. FARLEY, *Judge*, filed a dissenting opinion in which NEBEKER, *Chief Judge*, and IVERS, *Judge*, joined. NEBEKER, *Chief Judge*, filed a dissenting opinion.

GREENE, *Judge*:  Virginia D. Trilles appeals a November 14, 1996, Board of Veterans' Appeals (Board) decision that determined that no new and material evidence had been presented to reopen a decision under 38 U.S.C. § 6103 forfeiting her VA benefits (except insurance benefits). Record (R.) at 1-8.  For the reasons that follow, the Court will vacate the Board's decision and remand the matter for readjudication.

# I. BACKGROUND

Mrs. Trilles was married to veteran Zosimo Trilles (R at 49) when he died in a Japanese prisoner of war camp in May 1942 (R. at 10).  In 1956, she filed a claim for VA benefits (R. at 39-42) and was awarded VA dependency and indemnity compensation (DIC) as the veteran's unremarried widow (R. at 57).  In 1960, she admitted that she had lived in a marital relationship with Santiago Penaflorida (Santiago) from 1943 through 1945 and that together they had had a child.  R. at 87-89, 91, 112-15.  Consequently, her benefits were discontinued because VA no longer recognized her as the unremarried widow of a veteran.  R. at 99.  She appealed that decision to the Board.  R. at 106.  Her appeal was denied.  R. at 109-10.

In 1970, Congress amended section 103(d) of title 38 of the United States Code to provide that the "remarriage of a widow of a veteran shall not bar the furnishing of benefits to her as the widow of the veteran if the remarriage has been terminated by death or has been dissolved by . . . divorce . . . ."  Pub. L. No. 91-376, § 4, 84 Stat. 787, 789 (1970) *reprinted in* 1970 U.S.C.C.A.N. 926, 929.  In 1971, by administrative decision, Mrs. Trilles' VA benefits were restored based on that amendment.  R. at 190-92.

A VA field investigation was initiated in 1985 to confirm Mrs. Trilles' identity, the validity of her marriage to the veteran, and her marital status after the restoration in 1971.  R. at 269.  During this investigation, she provided a sworn statement attesting that, following the veteran's death, she was forced to marry Augusto Manilla Malapitan (Augusto) in 1949.  R. at 245-47.  A marriage certificate issued on May 25, 1987, confirmed that Virginia Trilles was married to Augusto on February 26, 1949.  R. at 261.  Further, the investigation report included a copy of a death certificate, issued on May 25, 1987, confirming that Augusto had died on January 9, 1955.  R. at 259.  This certificate was issued by the office of the Civil Registrar, Iroson, Sorsogon, the Philippines.  *Id.* With this evidence, VA initiated action to terminate Mrs. Trilles' benefits, alleging that she had deliberately presented fraudulent statements to VA when she declared in her 1956 application for benefits and again in her depositions in 1959 and 1970 that she had not remarried since the veteran's death in 1942.  R. at 71-72, 197-98.  VA notified Mrs. Trilles of its intent to terminate her benefits and provided her with an opportunity to explain or present other evidence on her behalf.  R. at 272-74.  She also was advised of her right to a hearing and to be represented by counsel. *Id.*  In response,

she attested that the marriage was invalid because it was the result of coercion and duress. Thus, she claimed that she had never considered Augusto her husband. R. at 279-80. Two additional affiants swore that in January 1949 they had heard that she had been "forcibly taken by armed men." R. at 282, 284.

In April 1988, the Veterans' Administration (now Department of Veterans Affairs) Compensation and Pension Service issued an administrative decision that Mrs. Trilles had made a fraudulent statement in connection with her application for VA benefits and thus declared, under 38 U.S.C. § 3503(a) (now 38 U.S.C. § 6103(a)), that she had "forfeited all rights, claims, and benefits to which she might otherwise be entitled." R. at 292-95. In 1989, Mrs. Trilles filed an appeal of this decision to the Board. R. at 312-13. In her appeal to the Board, her written statement asserted the following: "In all humility, I admitted to have [sic] been married to Augusto Malapitan only, when somebody furnished the VA my Marriage Contract or Married [sic] Certificate. At first I don't believe that there was such marriage because Augusto Malapitan did not furnish me such marriage contract . . . . Hence, I denied of having married to Augusto Malapitan on two occasions that I was interviewed." *Id*. But, upon learning that a marriage certificate had been furnished to VA, she "readily admitted to have married . . . Augusto Malapitan when [she] was interviewed on March 19, 1987." *Id*.

A 1990 Board decision found that "the appellant, beyond a reasonable doubt, knowingly and deliberately, made and submitted to . . . VA false statements concerning her marital relationship with Augusto in obtaining VA benefits to which she had no legal entitlement," and declared that she "had forfeited all rights, claims and benefits under all laws administered by . . . VA (except laws pertaining to insurance benefits)," and denied revocation of forfeiture. R. at 324-26. She did not appeal, and that decision became final.

Since the 1990 decision, Mrs. Trilles has attempted to reopen the forfeiture decision by asserting that a "real" marriage to Augusto never occurred. In support of her contention, she has offered a March 1989 certification from the Chief of the Certification Section of the Office of the Civil Registrar General, National Statistics Office, Republic of the Philippines, stating that that office could not verify any marriage between her and Augusto and that verification should be sought from the office of the local Civil Registrar, Iroson, Sorsogon, where marriage records are kept. R. at

3

315. She also submitted a similar certification dated September 1987 from the Office of the Civil Registrar General stating that it could not verify the death of Augusto Malapitan. R. at 330. The November 1996 Board decision here on appeal determined that the statements from the civil registrars were not previously of record and were, therefore, new. The Board also determined that although these statements were new, they had no probative value because they "do not show that the marriage and the death did not take place, merely that the records could not be located at a later date." R. at 6. Moreover, the Board found that because the claims file already contained the marriage and death certificates at issue, the evidence presented was not sufficient to reopen Mrs. Trilles' claim for revocation of the forfeiture of VA benefits. R. at 5-6. This appeal followed.

On August 5, 1998, there was a call for and the Court voted for full Court review of this appeal. On December 8, 1998, the full Court ordered additional briefing. *Trilles v. West*, 12 Vet.App. 59 (1998) (en banc order). On February 8, 1999, the Secretary responded to the Court's order; he asserts that although declaration of forfeiture bars a person from receiving benefits, it was never contemplated by Congress or VA that the person could not attempt to reestablish eligibility for benefits either by presenting new and material evidence or by demonstrating clear and unmistakable error (CUE) in the previous decision declaring a forfeiture. Thus, he maintains that the new-and-material-evidence analysis adopted and conducted by the Board was proper and presents the correct question for review by the Court. Therefore, he contends that under *Hodge v. West*, 155 F.3d 1356 (Fed. Cir. 1998), the matter must be remanded to the Board to determine, under 38 C.F.R. § 3.156 (1998), whether new and material evidence exists to reopen the matter.

Mrs. Trilles, through counsel, also argues that a *Hodge* remand is in order. She also asserts that a remand is required to allow the Board, in the first instance, to address the forfeiture questions raised in the Court's briefing order.

4

## II. ANALYSIS

### A. Applicable Statutes and Regulations
Concerning 38 U.S.C. § 6103(a) Forfeiture

Section 6103, title 38, U.S. Code, provides:

(a) Whoever knowingly makes or causes to be made or conspires, combines, aids, or assists in, agrees to, arranges for, or in any way procures the making or presentation of a false or fraudulent affidavit, declaration, certificate, statement, voucher, or paper, concerning any claim for benefits under any of the laws administered by the Secretary (except laws pertaining to insurance benefits) shall forfeit all rights, claims, and benefits under all laws administered by the Secretary (except laws pertaining to insurance benefits).

(b) Whenever a veteran entitled to disability compensation has forfeited the right to such compensation under this section, the compensation payable but for the forfeiture shall thereafter be paid to the veteran's spouse, children, and parents. Payments made to a spouse, children, and parents under the preceding sentence shall not exceed the amounts payable to each if the veteran had died from a service-connected disability. No spouse, child, or parent who participated in the fraud for which forfeiture was imposed shall receive any payment by reason of this subsection. An apportionment award under this subsection may not be made in any case after September 1, 1959.

(c) Forfeiture of benefits by a veteran shall not prohibit payment of the burial allowance, death compensation, dependency and indemnity compensation, or death pension in the event of the veteran's death.

(d)(1) After September 1, 1959, no forfeiture of benefits may be imposed under this section or section 6104 of this title upon any individual who was a resident of, or domiciled in, a State at the time the act or acts occurred on account of which benefits would, but for this subsection, be forfeited unless such individual ceases to be a resident of, or domiciled in, a State before the expiration of the period during which criminal prosecution could be instituted. This subsection shall not apply with respect to (A) any forfeiture occurring before September 1, 1959, or (B) an act or acts which occurred in the Philippine Islands before July 4, 1946.

(2) The Secretary is hereby authorized and directed to review all cases in which, because of a false or fraudulent affidavit, declaration, certificate, statement, voucher, or paper, a forfeiture of gratuitous benefits under laws administered by the Secretary was imposed, pursuant to this section or prior provisions of law, on or before September 1, 1959. In any such case in which the Secretary determines that the forfeiture would not have been imposed under the provisions of this section in

5

effect after September 1, 1959, the Secretary shall remit the forfeiture, effective June 30, 1972. Benefits to which the individual concerned becomes eligible by virtue of any such remission may be awarded, upon application therefor, and the effective date of any award of compensation, dependency and indemnity compensation, or pension made in such a case shall be fixed in accordance with the provisions of section 5110(g) of this title.

38 U.S.C. § 6103.

Section 501 of title 38, U.S. Code, provides:

(a) The Secretary has authority to prescribe all rules and regulations which are necessary or appropriate to carry out the laws administered by the Department and are consistent with those laws, including--

(1) regulations with respect to the nature and extent of proof and evidence and the method of taking and furnishing them in order to establish the right to benefits under such laws;

(2) the forms of application by claimants under such laws;

(3) the methods of making investigations and medical examinations; and

(4) the manner and form of adjudications and awards.

(b) Any rule, regulation, guideline, or other published interpretation or order (and any amendment thereto) issued pursuant to the authority granted by this section or any other provision of this title shall contain citations to the particular section or sections of statutory law or other legal authority upon which such issuance is based. The citation to the authority shall appear immediately following each substantive provision of the issuance.

38 U.S.C. § 501(a), (b). Under the Secretary's section 501 authority, VA regulations have been prescribed to establish adjudicative procedures for rendering forfeiture decisions. These implementing regulations are supplemented by VA manuals and internal memoranda on how forfeiture decisions are to be made, including specific procedural protections that are to be afforded to a VA benefits recipient (and to a claimant for VA benefits). These regulations have remained substantially the same since they were promulgated in the early 1960s. *See* 38 C.F.R. §§ 3.900 through 3.905 (1998) at Appendix. The Court notes that in 1953, VA Regulation No. 2907(B) was promulgated to ensure that VA applied these provisions "only in those cases wherein it is established

6

*beyond a reasonable doubt* that fraud has been committed." *See* VA Regulations Claims Transmittal Sheet 96, p. 157 (May 13, 1953), excerpted at Secretary's Response, Exhibit E, page 5 (emphasis added). Although no longer prescribed by regulation, VA adheres to this beyond-a-reasonable-doubt standard. R. at 3, 295, 324.

To address forfeiture cases arising outside the United States, where prosecution under the U.S. criminal code and the attendant procedural rights for the accused could not be relied upon, VA promulgated specific procedures for adjudicating allegations of fraud. Specifically, cases arising from acts by benefits recipients residing in the Philippines are to be adjudicated under Chapter 36, VA ADJUDICATION PROCEDURE MANUAL, M21-1 [hereinafter MANUAL M21-1]. Under these provisions, the Manila VA Regional Office (RO) conducts a preliminary adjudication of the alleged forfeiture and, if established, forwards the matter to the Director, Compensation and Pension Service, VA Central Office. *See* 38 C.F.R. §§ 3.100(b), 3.905(a) (1998); *see also* MANUAL M21-1, Part IV, ¶ 36.08a (Apr. 3, 1992). Forfeiture will not be declared before the RO has sent to the person affected a written notice containing the following: (1) A statement of the specific charges, (2) a detailed statement of evidence supporting the charges, (3) notice of the right to submit evidence or a statement in rebuttal or explanation within 60 days, (4) citation and discussion of the applicable statute, and (5) notice of the right to a hearing and representation by counsel. *See* 38 C.F.R. § 3.905(b). Only after such a notice is a forfeiture decision to be made.

A declaration of forfeiture, which affects the provisions of VA benefits, is one that is a decision referred to in section 511 of title 38, U.S. Code. This statute provides:

> (a) The Secretary shall decide all questions of law and fact necessary to a decision by the Secretary under a law that affects the provision of benefits by the Secretary to veterans or the dependents or survivors of veterans. Subject to subsection (b), the decision of the Secretary as to any such question shall be final and conclusive and may not be reviewed by any other official or by any court, whether by an action in the nature of mandamus or otherwise.

> (b) The second sentence of subsection (a) does not apply to--

> > (1) matters subject to section 502 of this title;

> > (2) matters covered by section 1975 and 1984 of this title;

(3) matters arising under chapter 37 of this title; and

(4) matters covered by chapter 72 of this title.

38 U.S.C. § 511. Further, section 7104(a) provides: "All questions in a matter which under section 511(a) is subject to decision by the Secretary shall be subject to one review on appeal to the Secretary. Final decisions on such appeals shall be made by the Board." 38 U.S.C. § 7104(a). In forfeiture cases, as in claims for VA benefits, *see Cox v. West*, 149 F.3d 1360 (Fed. Cir. 1998) ("section 7104 of title 38 confers jurisdiction on the Board over questions arising under section 511(a), and a claimant may in turn appeal an adverse Board ruling to the Court of Appeals for Veterans Claims under 38 U.S.C. § 7252(a) (1994)"), sections 511 and 7104 give the person adversely affected the right to appeal the forfeiture decision to the Board. Thus, as with claims for VA benefits, the Secretary has promulgated rules allowing for final forfeiture decisions to be reopened upon the presentment of new and material evidence or upon a showing of CUE in a previous final decision. *See* 38 C.F.R. §§ 3.104(a), 3.105, 3.905(d), 20.1103, 20.1104 (1998).

## B. Applicable Case Law and Analysis

Over the years, the Court has considered the question of VA forfeitures under 38 U.S.C. §§ 6103 and 6104. Section 6104 provides for forfeiture of VA benefits in cases involving treasonous acts. For these section 6104 cases, the Secretary has promulgated administrative adjudication procedures similar to those governing section 6103 cases. *See* 38 C.F.R. §§ 3.902, 3.904(b) (1998).

In *Reyes v. Brown*, the Court considered the case of a veteran's widow seeking to reopen her claim to remove VA's forfeiture of her VA benefits. *Reyes*, 7 Vet.App. 113, 114-15 (1994). She had been receiving VA benefits since 1942. *Id*. In 1962, VA declared forfeiture of her benefits under section 3503(a) (now 6103(a)) because she had concealed the fact that she was living in a marital relationship with Esteban Oblena. *Id*. In 1970, she unsuccessfully sought restoration of her VA benefits. In 1991, she sought to reopen her claim by submitting Oblena's death certificate. The Board determined that the evidence submitted was not new and material and denied reopening. She appealed. Applying a new-and-material-evidence standard under 38 U.S.C. § 5108, the Court, on de novo review, also found that the evidence presented was not new and material and held that the Board did not err by not reopening the appellant's claim. *Id*. at 115-16.

8

In *Villaruz v. Brown*, the Court again employed a new-and-material-evidence reopening analysis. *Villaruz*, 7 Vet.App. 561 (1995). In *Villaruz*, the appellant's rights to VA benefits had been declared forfeited in 1956 because he had been found to have made false or fraudulent statements to VA and to have rendered assistance to the enemy. *Id*. at 563. In 1983, the appellant sought to reopen his claim for revocation of the forfeiture and provided additional evidence. *Id*. The Board found that the appellant had submitted new and material evidence sufficient to reopen his claim, but decided after reopening that the evidence was insufficient to revoke the forfeiture of benefits under 38 U.S.C. §§ 6103 and 6104. *Id*. at 564. The Court held, on de novo review, that the Board did not err in reopening the appellant's claim for revocation of a forfeiture, *id*. at 565, but vacated the Board decision and remanded the matter to the Board to provide an adequate statement of reasons or bases in assessing the credibility of the appellant's new evidence, *id*. at 567.

However, in *Villeza v. Brown*, the Court, after determining that the appellant was indeed seeking to reopen the forfeiture question, departed from recognizing that question as one requiring the presentment of new and material evidence. *Villeza*, 9 Vet.App. 353, 355-57 (1996). Rather, the Court determined that because the appellant's benefits had been declared forfeited, she was not a "benefits-eligible claimant" and then held that she no longer possessed eligibility status. *Id*. at 357. Relying on *Aguilar v. Derwinski*, 2 Vet.App. 21, 23 (1991) (holding "[a]s a threshold matter, one claiming entitlement as the spouse of a veteran has the burden to come forward with preponderating evidence of a valid marriage under the laws of the appropriate jurisdiction"), the Court held that the appellant had to establish her status as a claimant by a preponderance of the evidence. *Villeza*, 9 Vet.App. at 357.

The Court extended the preponderance-of-the-evidence burden further still in *Tulingan v. Brown*, 9 Vet.App. 484 (1996). In *Tulingan*, the veteran was granted service connection for a wound sustained in 1949. *Id*. at 485. Later, VA determined that he had either directly or indirectly rendered aid to the enemy and had thereby forfeited his VA benefits. *Id*. Tulingan's VA benefits were restored in 1965 and declared forfeited again fifteen years later when the 1965 restoration was found to be the result of CUE. *Id*. Tulingan again attempted to regain his benefits. In the early 1990s, the Board concluded that he had not submitted new and material evidence. He appealed to this Court, which concluded that he had submitted new and material evidence and that the Board

must reopen the claim and evaluate it in light of all the evidence, both old and new. *Id*. at 486. On remand, the Board reviewed the evidence and sustained the forfeiture. On appeal again, the Court treated the case differently from the way it had previously treated it. The Court ruled that "where a veteran has lost his status as a benefits-eligible claimant, he must establish it anew by a preponderance of the evidence." *Id*. at 487 (citing *Villeza, supra*). The Court held that the Board did not err in sustaining the forfeiture. *Id*.

In none of these precedential cases did the Court recognize or discuss the VA regulatory procedures established for forfeiture cases. Rather, in the more recent cases the Court created a procedural concept that required stripping a benefits recipient or a claimant of his or her title 38 status and mandated that the person establish status anew by a preponderance of the evidence. Because the Court failed to consider the promulgated VA forfeiture procedures, the same procedures relied upon by the parties in this case, we now must revisit the forfeiture cases and review them in the context of the statute and implementing regulations to determine if these longstanding regulations and those court decisions are in accord with the statutory scheme.

## C. Discussion

### 1. Statutory Construction

As noted earlier, both parties maintain that, although a section 6103 forfeiture in effect bars a person from rights, claims, and benefits under title 38, it was not Congress' intent to preclude permanently a person from challenging the basis for the forfeiture decision under procedures established by the Secretary. Deciding the correctness or incorrectness of this position requires the Court to interpret the statute as a whole and to determine the reasonableness and validity of VA's implementing regulations.

The proper interpretation of a statute is to be made by the Court de novo. *See Butts v. Brown*, 5 Vet.App. 532, 539 (1993) (en banc). The starting point in interpreting a statute is examining the language itself, for "if the intent of Congress is clear, that is the end of the matter." *Cacatian v. West*, 12 Vet.App. 373, 376 (1999) (citing *Gardner v. Brown*, 5 F.3d 1456, 1456 (Fed. Cir. 1993), *aff'd*, 513 U.S. 115 (1994)). The plain meaning of the statute is found in examining the specific language at issue and the statute's overall structure. *Id*.; *see also Meeks v. West*, 12 Vet.App. 352, 354 (1999) ("Principles of statutory construction require that, where a statute has plain meaning, a Court shall

give effect to that meaning . . . . [E]ach part or section [of a statute] should be construed in connection with every other part or section so as to produce a harmonious whole." (internal quotations and citations omitted)). However, if "it is clear that . . . the literal import of the text . . . is inconsistent with the legislative meaning or intent, or such interpretation leads to absurd results," NORMAN J. SINGER, SUTHERLAND ON STATUTORY CONSTRUCTION § 46.07 (5th ed. 1992), the Court will not reach that result. *See United States v. Brown*, 333 U.S. 18, 25-26 (1948); *Brooks v. Donovan*, 699 F.2d 1010, 1011-12 (9th Cir. 1983); *Demko v. University*, 44 Fed. Cl. 83, 87 (1999).

The language of section 6103 plainly states that a person who commits fraud in connection with his or her claim or award of benefits, loses all rights, claims, and benefits. However, it is completely silent on the forfeiture process and whether Congress intended that a section 6103 bar would forfeit *procedural* rights so as to prevent the affected person from ever revisiting or again contesting the basis for the forfeiture decision. We do not find a clear intent of Congress manifested in the statute as to either of these matters. Moreover, were we to conclude that the statute itself, literally read, provided for the forfeiture of procedural rights afforded under title 38 of the United States Code and the Code of Federal Regulations, we would hold that to be an absurd result when considering the statute's overall structure and concepts of fundamental fairness and would proceed to examine the legislative history. As the U.S. Supreme Court reasoned in *Fong Haw Tan v. Phelan*, 333 U.S. 6, 10 (1948), in a similar context:

> Such a forfeiture [loss of permanent residency and deportation] is a penalty. To construe this statutory provision less generously to the [person] might find support in logic. But since the stakes are considerable for the individual, we will not assume that Congress meant to trench on his freedom beyond that which is required by the narrowest of several possible meanings of the words used.

Therefore, we proceed to examine the legislative history in order to clarify what procedure is contemplated.

### 2. Legislative and Administrative History

A review of the legislative history of the 38 U.S.C. § 6103(a) forfeiture provisions indicates that the current version is derived from Pub. L. No. 85-857, 72 Stat. 1105, 1240 (1958) (originally codified at 38 U.S.C. § 3503). In 1959, this forfeiture provision was amended, Pub. L. No. 86-222, § 1, 73 Stat. 432 (1959), in part, to eliminate the authority of the VA Administrator (now the

Secretary of Veterans Affairs) to impose forfeiture on a person who had committed a fraudulent act when he or she resided, or was domiciled, in a State between the time of the commission of the fraud and the expiration of the applicable criminal statute of limitations. *See* S. REP. NO. 664 (1959), *reprinted in* 1959 U.S.C.C.A.N. 2216-22. When considering this amendment, Congress expressed its desire to alleviate its concern that forfeiture was a severely harsh, duplicative punishment; "impos[ed] . . . additional penalties . . . comparable . . . to other governmental agencies"; and was applied inequitably within VA. *Id*. at 2220. It was believed that administrative forfeiture cases within the United States could be eliminated in favor of reliance upon prosecuting fraud under the U.S. criminal code. *Id*. at 2219-20. Further, it was noted that no other Federal benefits structure permitted prosecution and administrative forfeiture for filing false or fraudulent statements in connection with applying for or receiving the benefits. *Id*. at 2220. In the course of the legislative process that brought about the liberalization of this forfeiture provision, specific recommendations were made concerning the review of the forfeiture procedure. Among the recommendations was one that "changes in the forfeiture program should be implemented by appropriate changes in the law and Veterans' Administration administrative regulations." STAFF OF HOUSE COMM. ON VETERANS' AFFAIRS, FORFEITURE OF VETERANS' RIGHTS, 85 Cong., 2d Sess., 3 (Comm. Print 196, June 26, 1958). Moreover, it was commented that a permanent bar would be too severe a penalty because the administrative forfeiture procedure did not have the built-in safeguards of a trial. *Id*. at 7-8. Notwithstanding these concerns and the amendment, a person who had been found to commit fraud while not residing or being domiciled in a State remained subject to the forfeiture. *See* 38 U.S.C. § 101(20) (defining a state as "each of the several States, Territories, and possessions of the United States, the District of Columbia, and the Commonwealth of Puerto Rico."). Additionally, section 6103(d)(1) authorizes forfeiture actions for acts occurring in the Philippine Islands after July 4, 1946, the date of Philippine independence from its previous status as a territory of the United States. Thus, Philippine citizens remained subject to forfeiture declarations under section 6103(d)(1) for their fraudulent acts in connection with applying for or receiving VA benefits.

Historically, VA has treated attempts to overturn forfeiture declarations as claims to revoke these forfeitures. Therefore, under VA practice, when one attempts to have forfeited benefits restored, he or she is attempting to reopen a claim for revocation of forfeiture (i.e., to reopen the

decision that declared a forfeiture of benefits). Despite some inconsistent terminology, the action is essentially one to reopen the forfeiture matter in a procedure similar to reopening disallowed claims for VA benefits as mandated by 38 U.S.C. § 5108. *See* VA Regulation 1530(D) (Sept. 13, 1935) (authorizing VA's Central Committee on Waivers and Forfeitures "[t]o review and modify its decision upon the submission of new evidence"); VA Regulation 2910(F) (May 13, 1953) (authorizing VA's Central Committee on Waivers and Forfeitures to "review and modify its decisions upon the receipt of new and material evidence, or upon [CUE]").

The Secretary's February 1999 response includes the following statement concerning the congressional history behind the enactment of section 6103.

> In the report of a hearing concerning the 1959 legislation, a special subcommittee of the House Committee on Veterans' Affairs reproduced a 1956 VA pamphlet (VA Pamphlet 8-1) detailing the rules of procedure governing forfeiture determinations by the Board on Waivers and Forfeitures, the organization within VA's Department of Veterans Benefits which then had authority to make forfeiture determinations. *Forfeiture of Veteran Benefits: Hearings on H.R. 7106 Before a Special Subcomm. of the House Comm. On Veterans' Affairs*, 86th Cong., 1st Sess. 258-63 (1959) . . . . Sections 39 and 40 of that pamphlet expressly provided, respectively, that declarations of forfeiture could be reconsidered on the basis of new and material evidence or allegations of error in the forfeiture decision. *Id*. at 263 . . . . [P]rovisions authorizing review of otherwise final forfeiture decisions had been included in VA regulations since 1935. . . . VA Regulation 2910(f) (May 13, 1953); . . . 38 C.F.R. § 5.10(f) (1956) (same as VA Regulation 2910(f)) . . . .

Response at 3-5.

Although VA's regulations do not expressly state the method of review of final forfeiture decisions, 38 C.F.R. § 3.905(d) does provide that "[a] decision of forfeiture is subject to the provisions of § 3.104(a)." Section 3.104(a) recognizes the finality of decisions by an agency of original jurisdiction and provides that a "final and binding agency decision shall not be subject to revision on the same factual basis except by duly constituted appellate authorities or except as provided in § 3.105 of this part." 38 C.F.R. § 3.104(a) (1998). Section 3.105 permits revision of a final decision based on CUE. 38 C.F.R. § 3.105 (1998). The language of section 3.104(a), "shall not be subject to revision on the same factual basis," is similar to the language of 38 U.S.C. § 7104(b), which allows reopening upon the presentment of new and material evidence, as provided for in 38 U.S.C. § 5108, of a claim previously disallowed by the Board. *See also* 38 C.F.R. § 3.156

(1998). The above provisions, promulgated by the Secretary, thus authorize revoking a forfeiture declaration because of CUE in that earlier decision declaring forfeiture or on the basis of new and material evidence.

### 3. *Deference to the Secretary's Interpretation of Statute and Regulations*

It is the duty of this Court to "decide all relevant questions of law, interpret constitutional, statutory, and regulatory provisions, and determine the meaning or applicability of the terms of an action of the Secretary." 38 U.S.C. § 7261(a)(1). Essentially, the Secretary urges the Court to reconcile the conflicting forfeiture case law and to defer to VA's forfeiture procedures as a reasonable interpretation of a statute in which Congress was silent concerning the *procedures* for adjudicating and declaring forfeiture of benefits. In *Chevron v. Natural Resources Defense Council*, the United States Supreme Court recognized that Congress frequently leaves certain details unspecified in a statutory scheme, and delegates rulemaking authority to an agency to fill in the details necessary to administer the statute. *Chevron*, 467 U.S. 837, 843 (1984). The Secretary has that authority under section 501 and has promulgated regulations and procedures. "Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id*. at 843-44; *see also Morton v. Ruiz*, 415 U.S. 199, 231 (1974); *Hodge v. West*, 155 F.3d 1356, 1360-61 (Fed. Cir. 1998). In *Chevron*, the Supreme Court provided the following guidance to reviewing courts:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the Court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron*, 467 U.S. at 842-43 (footnotes omitted). The Secretary argues as to Congressional intent:

> Nothing in the language or history of the 1959 statute expressly addressed the validity of the VA procedures concerning review of forfeiture decisions based on new and material evidence or [CUE]. However, Congress' awareness of the provisions permitting such review, coupled with Congress' stated concerns that forfeiture was

14

a severe penalty and that inequities existed in VA's administration of the forfeiture provisions, may suggest that Congress did not intend to insulate forfeiture decisions from review under the generally available mechanisms for reopening or revising otherwise final VA decisions.

Secretary's Response at 4-5.

The Court is persuaded that the Secretary's view of Congress' intent in enacting this statute has merit. A conclusion that a forfeited benefits recipient or claimant would be permanently barred from filing future claims for other benefits or from challenging the basis of the forfeiture decision is not supported when construing every part or section of the statute and would yield an absurd result. After close scrutiny of all provisions of section 6103, what becomes most clear is Congress' intent as expressed in the legislative history to ameliorate the severe and draconian nature of the forfeiture statute. Moreover, as the legislative history demonstrates, and as pointed out by the Secretary and the appellant, Congress reviewed and did not express any disapproval with the then-current VA adjudicative forfeiture procedures promulgated by the Secretary. *See* FORFEITURE OF VETERAN BENEFITS: HEARINGS ON H.R. 7106 BEFORE A SPECIAL SUBCOMM. OF THE HOUSE COMM. ON VETERANS' AFFAIRS, 86th Cong., 1st Sess. 258-63 (1959) (House Committee's detailed description and reproduction of pamphlet outlining VA procedures covering forfeiture decisions). That Congress intended no blanket forfeiture is evidenced by subsections (b) and (c) of section 6103. For example, disability compensation continues in a determined amount to eligible family members who did not participate in the fraudulent act; likewise, a veteran who has forfeited rights under section 6103 does not forfeit the right to a burial allowance or the right for his qualified and eligible dependents to claim death compensation, dependency and indemnity compensation, or death pension. *See* 38 U.S.C. § 6103(b) and (c).

As the foregoing discussion illustrates, Congress did not address the precise question of the procedures to be followed in forfeitures. When Congress was considering amending the statute, VA already had established procedures in place of which Congress was fully aware and to which Congress had given tacit approval. *See Helvering v. R.J. Reynolds Tobacco Co.*, 306 U.S. 110, 114-15 (1939) (where Department of Treasury had embodied administrative construction of definition of "gross income" in regulations and where Congress had not amended statutory definition of "gross income" in successive revenue acts, "Congress must be taken to have approved the administrative

construction and thereby to have given it force of law"); *see also Cammarano v. United States*, 358 U.S. 498, 510-11 (1959) (failure of legislative body to amend ambiguous statute when agency adopted unambiguous regulation interpreting that statute supported "conclusion that the regulation was not inconsistent with the intent of the statute" (internal quotations and citations omitted)); *York v. Fed. Home Loan Bank Bd.*, 624 F.2d 495, 499 (4th Cir. 1980) (in view of "deference which is to be accorded an agency's construction of the statute it is authorized to enforce" and fact that Congress had been apprised of Bank Board's actions by agency itself, court held that "by declining to act despite the Bank Board's known policy . . . , Congress has tacitly approved the . . . action").

In general, this Court defers to a regulatory construction of a statute that is adopted by the Secretary if that construction is consistent with the language of the statute and is a reasonable interpretation of the law. *See McGuire v. West*, 11 Vet.App. 274, 278-79 (1998). Additionally, the "Supreme Court has counseled that special deference must be accorded to an agency's contemporaneous interpretation of its founding statutes, especially when the interpretation has remained in effect for a long period of time and Congress has never expressed its disapproval." *Lorenzano v. Brown*, 4 Vet.App. 446, 450 (1993) (citing *EEOC v. Associated Dry Goods Corp.*, 449 U.S. 590, 600 n.17 (1981)). In revising and refining the forfeiture statute, Congress left untouched VA's preexisting interpretation and historical procedures implementing that statute. The Secretary has acted within his statutory authority under 38 U.S.C. § 501 in establishing regulations for forfeiture adjudications and for their revision by reopening forfeiture declarations upon the presentment of new and material evidence or by findings that there was CUE in the previous forfeiture decision. Reviewing the VA regulations and the Secretary's forfeiture review practices in this context and mindful of the penal nature of forfeiture, *see Fong Haw Tan, supra*, we hold that they are promulgated under a permissible construction of the statute and constitute plausible and reasonable interpretations of the law. *See Winn v. Brown*, 8 Vet.App. 510, 515 (1996) (citing *Chevron*); *Lorenzano, supra*. Therefore, we will follow the Supreme Court's counsel and accord special deference to those VA interpretations and read the statute so as to impose its penalties no more broadly than "that which is required by the narrowest of several possible meanings of the words used." *Fong Haw Tan, supra*.

16

Because we defer to the Secretary's regulations, our previous holdings in forfeiture cases that did not accord such deference lose their validity. By not recognizing in those cases the Secretary's forfeiture regulations and procedures and determining if they reasonably interpret the statute, the Court improperly negated them. *See Chevron*, *supra*; *Hodge,* 155 F.3d at 1364 (holding that this Court erred in not applying VA regulation 38 C.F.R. § 3.156(a) on reopening disallowed claims). Accordingly, we must overrule these decisions (*Villeza and Tulingan*, both *supra*) where the Court has failed to recognize the regulatory adjudicative procedure and in its decisions has held that the appellant has lost status as a benefits-eligible claimant. We now hold that a VA benefits recipient or claimant who has been the subject of a final decision declaring forfeiture of eligibility for VA benefits may have that final decision reopened upon the presentment of new and material evidence or revised based on a finding of CUE in the original forfeiture decision.

### D. Applying the New-and-Material-Evidence Standard to Reopen Declarations of Forfeiture

In this case, the Board applied the criteria for reopening on the basis of new and material evidence enunciated in *Colvin v. Derwinski*, 1 Vet.App. 171, 174 (1991) (requiring that "material" evidence be "relevant [to] and probative of the issue at hand" and present a "reasonable possibility that the new evidence, when viewed in the context of all the evidence, both new and old, would change the outcome"). *See also Sutton v. Brown*, 9 Vet.App. 553, 562 (1996); *Evans v. Brown*, 9 Vet.App. 273, 283 (1996); *Cox v. Brown*, 5 Vet.App. 95, 98 (1993); *Justus v. Principi,* 3 Vet.App. 510, 513 (1992). However, the *Colvin* materiality test was overruled by the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) in *Hodge* for purposes of reopening disallowed claims for veterans' benefits. *Hodge, supra*. In *Hodge*, the Federal Circuit held that the VA regulation on reopening, 38 C.F.R. § 3.156(a), provided a reasonable interpretation of the materiality requirement of 38 U.S.C. § 5108 "for purposes of reopening claims for the award of veterans' benefits." *Id.* at 1362. Recognizing the pro-claimant environment created by the general VA statutory scheme, the Federal Circuit determined that the application of concepts such as were involved in the Social Security adjudication process, which the Federal Circuit characterized as a system that was not designed to be "strongly and uniquely pro-claimant" -- in this instance a requirement that there must be a reasonable possibility that new evidence would change the outcome of the claim -- was

inappropriate. The Federal Circuit expressed a concern that applying such a strict standard to the VA nonadversarial process might undermine the intended operation of the veterans' benefits system by altering its traditional beneficial character. *Id.* at 1356-57.

Under currently applicable law, then, the Secretary must reopen a previously and finally disallowed claim when "new and material evidence" is presented or secured. *See* 38 U.S.C. §§ 5108, 7104(b), 7105(c); 38 C.F.R. § 3.156(a) (1998). When a claim to reopen is presented under section 5108, an analysis is triggered that may entail three steps. *See Winters v. West*, 12 Vet.App. 203, 206 (1999) (en banc). The first step involves a determination as to whether the evidence presented or secured since the last final disallowance of the claim is new and material. *See* 38 C.F.R. § 3.156(a). If the Secretary determines that the evidence is new and material, he must then reopen the disallowed claim and determine "whether the appellant's claim, as then reopened, is well grounded in terms of all the evidence in support of the claim, generally presuming the credibility of that evidence". *Elkins v. West*, 12 Vet.App. 209, 218-19 (1999) (en banc); *see also Winters*, 12 Vet.App. at 206-07. If the claim is not well grounded, that is the end of the matter. *See Winters*, 12 Vet.App. at 206. The Board in the November 14, 1996, decision on appeal determined that the evidence submitted by Mrs. Trilles, although new, was not probative of the issue whether she had committed fraud. Hence, the Board decided that the new evidence was insufficient to reopen her claim.

Against the backdrop of *Hodge* and *Elkins*, we must decide the appropriate remedy for this case. The Court acknowledges that efforts to overturn forfeiture decisions do not fit perfectly into the case law applicable to the nonadversarial VA claims adjudication process. As discussed in part II.C., above, the Secretary has determined that the decision to declare a forfeiture can be revisited on specific allegations of CUE in the previous forfeiture declaration or when new and material evidence has been presented. Although these concepts of CUE and reopening on the basis of new and material evidence are generally associated with the VA pro-claimant nonadversarial claims adjudication process, *see Hodge*, 155 F.3d at 1361 n.1 (citing *Brown v. Gardner*, 513 U.S. 115, 117-18 (1994)), forfeiture action is an adversarial process initiated by the Secretary to protect the public fisc from false or fraudulent claims and it must be declared "beyond a reasonable doubt." Because of its adversarial nature, the forfeiture process is not unlike the procedure for reopening verdicts in the criminal sector and adverse decisions by most administrative agencies. In criminal cases, it has

18

been held that a new trial must be granted only when the new evidence is material, that is, when there is a "reasonable probability that . . . the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). In somewhat adversarial administrative arenas, such as adjudications by the Social Security Administration, in order to reopen a previous decision there must be a "reasonable possibility that [the new evidence] would have changed the outcome of the Secretary's determination." *Chaney v. Schweiker*, 659 F.2d 676, 679 (5th Cir. 1981); *see Cox*, 5 Vet.App. at 99 (summarizing Social Security law in ten Circuits and concluding that "reasonable possibility" of outcome change test "represents the unanimous view of all ten circuit courts of appeals that have addressed this aspect of the standard for reopening [Social Security Disability] cases on the basis of 'new and material' evidence"); *see also Woolf v. Shalala*, 3 F.3d 1210, 1215 (8th Cir. 1993) (showing that eleven circuits have now adopted that test). Here, VA declared forfeiture against Mrs. Trilles (after having afforded her the procedural protections that normally accompany adjudications that may result in adverse decisions) only after she was found beyond a reasonable doubt, a standard much higher than the one involved in claims adjudication, to have committed acts requiring forfeiture of her benefits.

Nevertheless, and in light of *Hodge* and *Elkins*, both *supra*, because of our deference to the Secretary's procedures for deciding cases involving revocation of forfeitures, the Court believes that it would be a preferable procedure, as the parties urge, for the Secretary and the Board first to have an opportunity to address, in light of the adversarial nature of VA forfeiture, discussed above, what constitutes new and material evidence under 38 C.F.R. § 3.156(a) and 38 U.S.C. § 5108 for purposes of reopening prior forfeiture decisions. *Cf. Carbino v. Gober*, 10 Vet.App. 507, 511 (1997) (declining to address matter not addressed by the Board and noting that declination is also based on the belief that the "Secretary, the Board, and the General Counsel ought first to address the issue"). Therefore, we will vacate the Board decision pursuant to *Elkins* and *Hodge*, both *supra*, and remand for readjudication in order for the Secretary and the Board to address in the first instance what evidence is required for Mrs. Trilles to reopen the VA-benefits-eligibility forfeiture imposed upon her by evidence found to show beyond a reasonable doubt that she had committed fraud in seeking such benefits.

19

# IV. CONCLUSION

Accordingly, the order denying relief contained in the Board's November 14, 1996, decision is VACATED and the matter is REMANDED for expeditious readjudication consistent with this opinion. *See Allday v. Brown*, 7 Vet.App. 517, 533-34 (1995). On remand, the appellant will be free to submit additional evidence and argument on the remanded claim in accordance with *Kutscherousky v. West*, 12 Vet.App. 369, 372-73 (1999) (per curiam order). The Court notes that a remand by this Court and by the Board confers on an appellant the right to VA compliance with the terms of the remand order and imposes on the Secretary a concomitant duty to ensure compliance with those terms. *See Stegall v. West*, 11 Vet.App. 268, 271 (1998). A final decision by the Board following the remand herein ordered will constitute a new decision that, if adverse, may be appealed to this Court only upon the filing of a new Notice of Appeal with the Court not later than 120 days after the date on which notice of the new Board final decision is mailed to the appellant. *See Marsh v. West*, 11 Vet.App. 468, 472 (1998).

VACATED AND REMANDED.


KRAMER and STEINBERG, *Judges*, concurring: We concur wholeheartedly in the excellent majority opinion but write separately to address the dissenting opinions. Initially, we wish to express our emphatic agreement with the sentiments, eloquently expressed by the dissenters and the distinguished sources upon which they rely, regarding the traditional and continuing importance of venerating and providing for veterans (and their eligible family members). We also cannot deny the obvious allure of creating a system where the claims of honest, deserving veterans (and honest, deserving individuals claiming through veterans) are adjudicated in a more benevolent manner than the claims of dishonest, less deserving claimants. However, in an attempt to construct such a system, it appears that our dissenting colleagues have become lost in a maze of conflicting arguments and, even more importantly, have failed to recognize that, simply put, there is no statutory or regulatory authority to support their views. Indeed, the only scintilla of support for the dissenters' position derives from the flawed caselaw that they themselves have woven out of whole cloth as a mechanism to implement their policy views.

In attacking the majority's application of a new and material evidence standard to forfeiture decisions, our dissenting colleagues admonish the majority for failing to recognize that, pursuant to 38 U.S.C. § 6103(a) "'*all* rights, claims and benefits under *all* laws administered by the Secretary,'" including the procedural benefits of 38 U.S.C. § 5108, are lost upon forfeiture. *Infra* at __, slip op. at __ (quoting 38 U.S.C. § 6103(a) with emphasis added). The dissenters forcefully assert that there is "one and only one exception to the emphatic 'all . . . all' proscription" of section 6103(a)--the exception pertaining to insurance benefits. Yet they further proclaim that, although a forfeitee loses "'all' title 38 procedural . . . rights and benefits afforded to veterans and those eligible family members," the loss of such procedural rights does not prevent a forfeitee from having title 38 benefits, rights, and claims restored by "submitting preponderating evidence to show that the factual basis for the forfeiture decision was wrong." *Infra* at __, slip op. at __. The dissenters then conclude that the majority, in applying section 5108 to forfeiture decisions, has given away rights "to which only veterans are entitled" and which are "reserved for claimants untainted by fraud." For many reasons, as discussed below, we find the dissenters' analysis to be severely flawed and unpersuasive.

First, because the dissenters conclude that *procedural* rights are among the rights lost under section 6103(a), and because they maintain that the insurance exception is the *sole* exception to the statutory mandate that all rights are forfeited under section 6103(a), the logical conclusion of the dissenters' argument would be that a forfeiture decision, once final, would remain forever in effect --there being no available procedural method pursuant to which a forfeitee could attack the forfeiture decision. Yet, the dissenters, perhaps in an attempt to avoid this potentially unjust result, astoundingly then attempt to create a new (title 38?) procedural right that will survive forfeiture under their construct.

Second, the dissenters cite section 511 as the basis for the dubious new procedure they create, thus acknowledging that forfeiture matters are subject to a decision by the Secretary under 38 U.S.C. § 511(a) and thus apparently conceding that title 38 does indeed have some applicability to those who have forfeited their status as benefits-eligible claimants, notwithstanding their thesis that the "all . . . all" proscription of section 6103(a) refers to all laws under title 38. They fail to recognize, however, that once there has been a final decision on such a matter, title 38 provides express, limited paths for again obtaining an adjudication on that same matter. In the absence of clear and

21

unmistakable error (*see* 38 U.S.C. §§ 5109A, 7111 (allowing revision of decisions by the Secretary or the Board on grounds of clear and unmistakable error)), sections 5108 and 7104 and 7105(c) provide only one method--the submission of new and material evidence--for obtaining another adjudication once a matter has been finally disallowed. *See* 38 U.S.C. §§ 5108 ("If new and material evidence is presented or secured with respect to a claim which has been disallowed, the Secretary shall reopen the claim and review the former disposition of the claim."), 7104(b) ("Except as provided in section 5108 of this title, when a claim is disallowed by the Board, the claim may not thereafter be reopened and allowed and a claim based upon the same factual basis may not be considered."); 7105(c) ("If no notice of disagreement is filed in accordance with this chapter within the prescribed period, the action or determination shall become final and the claim will not thereafter be reopened or allowed, except as may otherwise be provided by regulations not inconsistent with this title."). As thoroughly discussed in the majority opinion, the Secretary has recognized this procedural framework by promulgating 38 C.F.R. §§ 3.104(a), 3.105, and 3.905(d) (1999), and the Court today finds that these provisions "constitute plausible and reasonable interpretations of the law." *Ante* at __, slip op. at 16.

Third, there is no statutory or regulatory authority for applying a preponderance standard to any determinations on matters subject to a decision by the Secretary. This standard finds no basis in title 38 but rather is a prior creation of the dissenting judges. *See Laruan v. West*, 11 Vet.App. 80 (1998) (en banc); *Sarmiento v. Brown*, 7 Vet.App. 80 (1994); *Aguilar v. Derwinski*, 2 Vet.App. 21 (1991); *cf. Laruan*, 11 Vet.App. at 86 (Kramer and Steinberg, JJ., concurring in part and dissenting in part); *Sarmiento*, 7 Vet.App. at 86 (Kramer, J., concurring); *Rogers v. Derwinski*, 2 Vet.App. 419, 422 (1992) (Steinberg, J., concurring); *Aguilar*, 2 Vet.App. at 23 (Kramer, J., concurring). By forcefully asserting that the preponderance standard is applicable in a forfeiture situation, the dissenters appear to recognize that the foundation upon which *Laruan* rests is seriously undermined by the opinion issued here today. Indeed, they are correct; *Laruan* cannot possibly remain viable in light of the instant opinion, because it would be inconceivable to apply a new and material evidence analysis when adjudicating claims to reopen forfeiture decisions, but to require a higher, preponderance burden for individuals who were simply unable (perhaps due to the loss of a DD Form 214) to provide the proper evidence of service at the time of the initial adjudication of their

claims. For the reasons set forth in the joint dissent in *Laruan*, 11 Vet.App. at 86 (Kramer and Steinberg, JJ., concurring in part and dissenting in part), we await with anticipation the formal demise of *Laruan*--when the Court acknowledges that status is merely one element of a claim, as the Federal Circuit has already prescribed (*Maggitt v. West*, __ F.3d __, __, No. 99-7023, slip op. at 6 (Fed. Cir. Feb. 3, 2000); *Collaro v. West*, 136 F.3d 1304, 1308 (Fed. Cir. 1998); *Grantham v. Brown*, 114 F.3d 1156, 1160 n.1 (Fed. Cir. 1997) (Archer, C.J., concurring)) and, indeed, as this Court has stated in *Fenderson v. West*, 12 Vet.App. 119, 125 (1999).

Fourth, our dissenting colleagues further confound their position by indicating that it is the liberal procedural rights of title 38, available, in their view, only to "veterans" and to those "untainted by fraud," that are lost upon forfeiture. However, because status as a veteran is not necessarily lost by virtue of a section 6103(a) forfeiture decision (*see, e.g.,* 38 U.S.C. § 6103(c) ("[f]orfeiture of benefits by *a veteran* shall not prohibit payment of[, inter alia,] the burial allowance . . . in the event of *the veteran's* death" (emphasis added))), a forfeitee also appears to continue to have status as a veteran for certain purposes. Furthermore, after September 1, 1959, the forfeiture provisions of section 6103(a) are not applicable to "any individual who was a resident of, or domiciled in, a State at the time the act or acts occurred on account of which benefits would, but for this subsection, be forfeited" (38 U.S.C. § 6103(d)(1)); and thus forfeiture under section 6103 generally would not be imposed on dishonest veterans living within the United States. Consequently, although the dissenters purport to create a system where the "indulgent" or "liberal" procedural rights of title 38 will be reserved for honest, deserving veterans, their construct apparently would prevent only certain dishonest claimants residing outside the United States from relying on such procedures and, even then, not for all purposes.

Fifth, although, as we indicated above, status as a veteran (or a surviving spouse) is not necessarily lost as the result of a forfeiture decision under section 6103, we feel compelled to respond to the dissenters' assertions that status determinations generally involve "a simple ministerial act," such as a cursory scan of the claimant's DD Form 214 or marriage certificate. Even though it is possible that status determinations, in certain instances, might be made by perusal of a single document, status may often involve complicated determinations regarding such matters as character of service, marital status, and dependent-child helplessness. For instance, a "veteran" is defined by

statute as "a person who served in the active military, naval, or air service, and who was discharged or released therefrom under conditions other than dishonorable." 38 U.S.C. § 101(2). Pursuant to 38 C.F.R. § 3.12(a) (1999), "[a] discharge under honorable conditions is binding on [VA] as to character of discharge." However, in order for a recipient of any other type of discharge to be eligible for VA benefits, a determination must be made as to whether that discharge will be considered to have been issued "under conditions other than dishonorable" (38 U.S.C. § 101(2))--a determination which must be made (in the absence of statutory guidance as to the conditions constituting an "other than dishonorable" discharge) under 38 C.F.R. § 3.12 (1999). *See Camarena v. Brown*, 6 Vet.App. 565, 567-68 (1994) ("Congress clearly intended that the phrase 'conditions other than dishonorable' was to include persons other than those receiving dishonorable discharges," and the Secretary, in a valid exercise of discretion, defined in 38 C.F.R. § 3.12 discharges considered to be under dishonorable conditions).

Indicative of the morass into which one descends when attempting to apply this regulation is 38 C.F.R. § 3.12(d)(4), which provides, inter alia, that a discharge because of "willful and persistent misconduct" will be considered to have been issued under dishonorable conditions, unless the discharge was because of a "minor offense" and "service was otherwise honest, faithful[,] and meritorious." In this regard, we note that the majority in *Laruan* (which included the dissenters in the instant case) was unable to apply this provision properly. In that case, the majority erroneously concluded that the appellant had received a dishonorable discharge and that he thus did not have status as a veteran (*see Laruan*, 11 Vet.App. at 82), when, in fact, the appellant had been "discharged without honor" due to a period of absence without leave. *See Laruan*, 11 Vet.App. at 90 (Kramer and Steinberg, JJ., concurring in part and dissenting in part). The majority there failed to recognize that the type of discharge noted on the appellant's DD Form 214 was not dispositive as to the character of his discharge for VA benefits purposes, and that a determination should have been made under 38 C.F.R. § 3.12(d)(4) as to whether his discharge was based on "willful and persistent misconduct" and would thus be considered to have been under dishonorable conditions. *Id*. This murky statutory and regulatory framework regarding status as a veteran is further complicated by provisions that create bars to benefits for individuals receiving discharges under certain specified circumstances but that do not address the resulting implications of the characterization of the

24

discharge. *See* 38 U.S.C. § 5303(a), (b); 38 C.F.R. § 3.12(b), (c) (1999); *see also Butler v. West*, 12 Vet.App. 7, 8 (1998) (Kramer, J., concurring) (even though petitioner was barred under section 5303(a) from receipt of VA benefits, he had status as veteran because his discharge was under honorable conditions).

Furthermore, considering the complicated statutory and regulatory provisions regarding the definition of surviving spouse, it hardly seems accurate to characterize status determinations under those provisions as "a simple exercise." *See* 38 U.S.C. § 101(3) ("'surviving spouse' means . . . a person of the opposite sex who was the spouse of a veteran at the time of the veteran's death, and who lived with the veteran continuously from the date of marriage to the date of the veteran's death (except where there was a separation which was due to the misconduct of, or procured by, the veteran without the fault of the spouse) and who has not remarried or (in cases not involving remarriage) has not since the death of the veteran, and after September 19, 1962, lived with another person and held himself or herself out openly to the public to be the spouse of such other person"); 38 C.F.R. § 3.50 (1999); 38 C.F.R. § 3.53 (1999) ("statement of the surviving spouse as to the reason for the separation will be accepted in the absence of contradictory information"); *see also Cacatian v. West*, 12 Vet.App. 373, 375-77 (1999) (holding that a person who was the legal spouse of a veteran but was participating in a marital-type relationship with someone other than the veteran at the time of the veteran's death was not eligible to claim surviving spouse status at the time of the veteran's death and that, therefore, the statute providing restoration of prior surviving spouse eligibility was not applicable); *Owings v. Brown*, 8 Vet.App. 17, 19-20 (1995) (discussing modifications to statutes and regulations applicable to surviving spouse who remarries and later reapplies for dependency and indemnity compensation); *Vecina v. Brown*, 6 Vet.App. 519, 522 (1994) (discussing cohabitation requirement of section 101(3) and noting that whether illicit relationship by spouse defeats requirement of continuous cohabitation depends on duration, frequency, and conditions of such relationship); *Gregory v. Brown*, 5 Vet.App. 108, 112 (1993) (discussing "without the fault of" requirement of section 101(3) and finding that fault or absence of fault is to be determined based on analysis of conduct at time of separation); *see also* 38 C.F.R. § 3.1(j) (1999) ("*Marriage* means a marriage valid under the law of the place where the parties resided at the time of marriage, or the law of the place where the parties resided when the right to

benefits accrued."); 38 C.F.R. § 3.205(a)(6) (1999) ("In jurisdictions where marriages other than by ceremony are recognized," proof of marriage is established by "the affidavits . . . of one or both of the parties to the marriage . . . setting forth all of the facts and circumstances concerning the alleged marriage, such as the agreement between the parties at the beginning of their cohabitation, the period of cohabitation, places and dates of residence, and whether children were born as the result of the relationship. This evidence should be supplemented by affidavits . . . from two or more persons who know as the result of personal observation the reputed relationship which existed between the parties to the alleged marriage including the periods of cohabitation, places of residences, whether the parties held themselves out as married, and whether they were generally accepted as such in the communities in which they lived.").

Does all of this sound like "a simple ministerial act"?

Finally, we note, in response to a statement by one of the dissenters ("In fairness to the many who have served and qualify for title 38 benefits, those who have cheated that system should remain outcasts until, and if, they show [sic] their forfeiture was [sic] in error through the usual adversarial process and not the indulgent VA process reserved for claimants untainted by fraud."), that a new and material evidence standard is not necessarily a light burden to meet; indeed, it is difficult to perceive of any evidence that would "bear[ ] directly and substantially upon the specific matter" (38 C.F.R. § 3.156(a) (1999)) other than evidence exculpatory of the claimant's misdeeds or evidence showing VA fraud in the original decision.

As we stated above, we recognize the superficial allure, in an ideal world, of a bifurcated system based on deserving and undeserving individuals such as the system that our dissenting colleagues have sought to fabricate. However, there are compelling reasons counseling against such a system. In the real world, with diverse factual situations and complicated statutory and regulatory provisions, the construct conjured by the dissenters would create an unnecessary and legally unfounded further complication, one that in all likelihood would make not one iota of difference in any outcome.

FARLEY, *Judge*, with whom NEBEKER, *Chief Judge,* and IVERS, *Judge,* join, dissenting: The issue presented in this appeal is governed by clearly defined principles of statutory construction. Our decision must begin and end with the *unambiguous* language of 38 U.S.C. § 6103. The intent

of Congress is clearly set out in the statute and that must be the end of the matter because the Court and VA must give full "effect to the unambiguously expressed intent of Congress." *See Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). The majority has chosen to ignore this commandment by the Supreme Court and therefore I must dissent.

## I.

The expression of our societal gratitude to those who served and sacrificed in our common defense is a tradition which predates even the founding of our nation. In 1636, the Plymouth Colony in Massachusetts provided that a soldier who returned "maimed would thereafter be maintained competently for the rest of his life at the expense of the public treasury." *See* Veterans Benefits and Judicial Review: Historical Antecedents and the Development of the American System (Fed. Research Div. of the Library of Congress, Washington, D.C., March 1992). When in 1865 President Abraham Lincoln committed the nation "to care for him who shall have borne the battle and his widow and his orphan" in his Second Inaugural Address, he was both following old precedent and creating new. After World War I, World War II, Korea, Vietnam, and more recent conflicts, a grateful nation has provided its veterans with home loans and educational benefits, medical care and pensions, disability and death compensation, as well as assistance to their widows and dependents. The rights and benefits established by title 38, United States Code, may be available to a veteran and his or her family members depending upon, inter alia, the time, length, and character of the veteran's service, the severity of any resulting disability, and the specific relationships between the veteran and his or her family members. Some of these substantive benefits, such as home loan guarantees and education, require only proof of military service; others require determinations as to the degree of disability and whether it was incurred or aggravated in service. Still others are dependent upon the amount of current income or whether a death was service connected.

In addition to these substantive benefits, other sections of title 38 provide significant procedural relaxations and red-tape-cutting devices which are available only to veterans and to those entitled to benefits because of a relationship to a veteran. For example, once a veteran has established a well-grounded claim, the Secretary of Veterans Affairs is obligated by statute to *assist* the veteran in the development of the facts pertinent to his claim. 38 U.S.C. § 5107(a). Indeed, the

entire claims process, at least until an appeal is filed with this Court, is non-adversarial: the Secretary and VA work for veterans. Pursuant to 38 U.S.C. § 5107(b), veterans enjoy the "benefit of the doubt" with regard to factual issues material to their claims. This unique standard of proof is unlike that available to any other civil plaintiff or claimant: a veteran prevails if the evidence is in equipoise. *See Gilbert v. Derwinski*, 1 Vet.App. 49, 53-56 (1990). A veteran is thus relieved of the burden of having to prove his or her claim by the traditional preponderance-of-the-evidence test used routinely in civil and administrative matters. *Id.; see, e.g., Jones ex rel. Jones v. Chater*, 101 F.3d 509, 512 (7th Cir. 1996) (in Social Security benefits cases, "preponderance of the evidence is the proper standard, as it is the default standard in civil and administrative proceedings"); *Bender v. Clark*, 744 F.2d 1424, 1429 (10th Cir. 1984); *Sea Island Broadcasting Corp. v. FCC*, 627 F.2d 240, 243 (D.C. Cir. 1980). Further, a veteran or a veteran's survivor, as a matter of statutory right, may have a finally denied claim reopened and reconsidered by the Secretary merely upon the submission of "new and material evidence." 38 U.S.C. § 5108. And, as the United States Court of Appeals for the Federal Circuit (Federal Circuit) recently made clear, it is easier for a veteran to reopen a finally denied claim because "new and material evidence" is a less restrictive test, one which focuses not upon the ultimate resolution of a claim but upon "the need for a complete and accurate record." *Hodge v. West*, 155 F.3d 1356, 1363 (Fed. Cir. 1998). The new and material evidence test recognized in *Hodge* imposes a lower burden to reopen, is most favorable to the veteran, and supports the general rule that any interpretative doubt must be resolved in favor of the veteran. *Id*. at 1361 n. 1; *see also Winters v. West*, 12 Vet.App. 203, 214 (1999) ("*Hodge* stressed that . . . new evidence that was not likely to convince the Board to alter its previous decision could be material if that evidence provided 'a more complete picture of the circumstances surrounding the origin of the veteran's injury or disability, even where it will not eventually convince the Board to alter its rating decision.'"). There is simply no other situation where an unsuccessful plaintiff or claimant can have his or her claim revisited under such a standard.

## II.

Only veterans, or those whose entitlement is based upon a relationship to a veteran, are entitled to the benefits of title 38. Virtually all of the provisions of title 38 use the word "veterans"

and are stated in directive language. *See, e.g.,* 38 U.S.C. § 1110 ("For disability resulting from personal injury suffered or disease contracted in line of duty . . . the United States *will pay* to any *veteran . . .* "); § 1121 ("The surviving spouse, child or children, and dependent parent or parent of any *veteran* who died . . . in line of duty . . . *shall be entitled to receive* compensation . . ."); § 1151 ("Where any *veteran* shall have suffered an injury, or an aggravation of an injury, as a result of hospitalization, medical or surgical treatment, or the pursuit of vocational rehabilitation . . . [which] results in additional disability to or the death of such *veteran*, disability or death compensation . . . *shall be awarded* . . ."); § 1310 ("When any *veteran* dies . . . from a service-connected or compensable disability, the Secretary *shall pay* dependency and indemnity compensation to such *veteran's* surviving spouse, children, and parents.") (Emphasis added).

So stated, these affirmative Congressional mandates to the Secretary necessarily preclude their negatives: the Secretary cannot refuse to pay a benefit to an eligible veteran. Indeed, Chief Justice Marshall discussed -- and dismissed -- this very point in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803). After noting that Congress had directed the Secretary of War to place on the pension rolls all persons named by him in a report to Congress in 1794, he observed:

> If [the Secretary] should refuse to do so, would the wounded veteran be without remedy? Is it to be contended, that where the law, in precise terms, directs the performance of an act, in which an individual is interested, the law is incapable of securing obedience to its mandate? . . . Is it to be contended that the heads of departments are not amenable to the laws of their country? Whatever the practice on particular occasions may be, the theory of this principle will certainly never be maintained. No act of the legislature confers so extraordinary a privilege, nor can it derive countenance from the doctrines of the common law.

*Id*. Just as the Secretary cannot refuse to provide benefits to entitled veterans, the Secretary cannot award veterans' benefits to those who are not veterans or who do not qualify due to the absence of a recognized relationship to a veteran. Such an act would be *ultra vires*. "In the American system, government functionaries are entitled to exercise only such powers as are conferred on them, expressly or impliedly, by positive law." NORMAN J. SINGER, SUTHERLAND ON STATUTORY CONSTRUCTION § 65.01 (5th ed. 1992); *see also Marbury, supra* at 174-75 ("Affirmative words are often, in their operation, negative of other objects than those affirmed . . . "); *see generally, Brown*

*v. Gardner*, 513 U.S. 115, 122 (1994) (courts have no obligation to defer to the Secretary's regulations where there are inconsistencies between the regulations and statutes).

At the very beginning of title 38, the word "veteran" is defined as follows:  "For the purposes of this title . . . [t]he term 'veteran' means a person who served in the active military, naval, or air service, and who was discharged or released therefrom under conditions other than dishonorable." 38 U.S.C. § 101(2).  Thus, one seeking title 38 benefits must establish two elements, active service and acceptable character of discharge, and must do so by a preponderance of the evidence because, by definition, the more relaxed benefit-of-the-doubt standard afforded solely to a veteran by 38 U.S.C. §5107(b) can only apply once one has established by the traditional standard of proof that one *is* a veteran.

> Thus, unless a claimant first carries the initial burden of establishing status as a veteran or veteran status for the person upon whose military service the desired benefits are predicated, the laws administered by the Secretary and the resources of the VA are not applicable or available.  Designation as a veteran bestows certain *procedural advantages* and *evidentiary benefits* which are unavailable to nonveteran claimants.
>
> * * *
>
> Thus, as the lower threshold burden of producing a well-grounded claim is available only to veterans, it follows that *establishing* such veteran status must satisfy the preponderance of the evidence standard common in civil and administrative litigation. In enacting title 38, Congress could not have intended that persons without requisite veteran status would benefit from the statutory presumptions and enactments reserved for veterans.  Indeed, and consistent with this nation's policy reasons for venerating veterans, without predicate veteran status there is no cognizable claim to be made before the Department or this Court under title 38.

*Laruan v. West*, 11 Vet. App. 80, 84 (1998) (emphasis added).

In the vast, *vast*, majority of instances, proof of eligibility requires only a simple ministerial act: submission of a DD Form 214.  A valid DD Form 214, which is the report of discharge issued to each veteran upon separation from military service, constitutes proof of eligibility by a preponderance of the evidence.  Proving eligibility, "veteran" status,  is so ministerial that it almost escapes notice in the adjudication process.  In those rare cases where a veteran's status cannot be proven by a DD Form 214 submitted by the veteran or the service department (*see* 38 U.S.C.

§ 5106), an individual seeking veterans benefits still must prove eligibility, i.e., qualifying service and character of discharge, by a preponderance of the evidence. *See Laruan, supra.*

With respect to dependents or those claiming benefits by virtue of their relationship with a veteran, they too must establish eligibility by a preponderance of the evidence and for the same reason: they cannot enjoy the benefits of title 38 unless and until they prove that they are qualified. Qualification as a dependent requires two elements: (1) a qualifying relationship (e.g., spouse; child; dependent parent; etc.) with (2) a veteran. Again, in most cases passing this two-part test by a preponderance of the evidence is a simple exercise. All that is required is the veteran's DD Form 214 and evidence of the relationship (e.g., a marriage certificate, birth certificate, adoption papers, etc.). Until eligibility is established, however, neither the substantive, the procedural, nor the evidentiary benefits available to veterans, including the relaxation of the standard of proof and the ability to reopen a claim upon the submission of new and material evidence, are available. *See Aguilar v. Derwinski*, 2 Vet.App. 21 (1991); *Laruan, supra*.

### III.

This case presents the rare instance where an individual whose eligibility for title 38 benefits had already been established forfeited that eligibility through acts of her own. The appellant was awarded dependency and indemnity compensation (DIC) in 1956 as the unremarried widow of Zosimo Trilles, a veteran. From the time she was first interviewed concerning her claim, she was advised of the forfeiture of rights provisions for fraud in connection with VA claims. R. at 71, 160. She has denied continually that she had been married to any man after the death of the veteran. R. at 39, 46, 71, 160.

Over the past forty years, however, different facts have evolved through the gathering of evidence and the admissions of the appellant herself. After the veteran's death, she not only held herself out as the wife of Santiago Penaflorida from 1943 to 1945, she also was married to Augusto Mancilla Malapitan in 1949. The appellant's statements denying these relationships served as the predicate for the April 1988 forfeiture by the Compensation and Pension Service (R. at 297-98, 300-01) which was upheld by the 1990 BVA decision. R. at 325. The BVA found that the appellant, a widow, had concealed her entry into a marital relationship with another man after the death of her

31

husband who had died in a Japanese prisoner of war camp. "[A]ppellant, beyond a reasonable doubt, knowingly and deliberately, made and submitted to . . . VA false statements concerning her marital relationship . . . in obtaining VA benefits to which she had no legal entitlement." R. at 324-25. Based upon this finding of fraud and pursuant to section § 6103, the Board held that the appellant had "forfeited all rights, claims and benefits under all laws administered by . . . VA (except laws pertaining to insurance benefits)." *Id.* The Board also explicitly found no reason to revoke the forfeiture. *Id.* When the appellant subsequently sought to have the forfeiture revoked, the BVA, in the November 14, 1996, decision presently before the Court, employed a 38 U.S.C. § 5108 "new and material evidence" analysis and, finding that the appellant had failed to submit such new and material evidence, refused to "reopen" her claim for revocation of the forfeiture.

The Board acted properly in refusing to revoke the forfeiture but it erred in applying the section 5108 "new and material evidence" analysis to a forfeiture by the Secretary pursuant to section 38 U.S.C. § 6103(a). Section 6103(a) provides as follows:

> Whoever knowingly makes or causes to be made or conspires, combines, aids, or assists in, agrees to, arranges for, or in any way procures the making or presentation of a false or fraudulent affidavit, declaration, certificate, statement, voucher, or paper, concerning any claim for benefits under any of the laws administered by the Secretary (except laws pertaining to insurance benefits) shall forfeit all rights, claims, and benefits under all laws administered by the Secretary (except laws pertaining to insurance benefits).

"As in any case of statutory construction, our analysis begins with 'the language of the statute.'" *Hughes Aircraft v. Jacobson*, 525 U.S. 432, 119 S. Ct. 755, 760 (1999); *see also Glover v. West*, 185 F.3d 1328, 1332 (Fed. Cir. 1999) ("In construing a statute or regulation, we commence by inspecting its language to ascertain its plain meaning.") Because the language is clear, because the language is unambiguous, our analysis must end there as well. *Id.*; *see also Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254, 112 S. Ct. 1146 (1992). There is no room for interpretation. *See Selley v. Brown*, 6 Vet.App. 196, 198 (1994) (where statute is clear, no interpretation is required). This Court and VA "must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43; *see also Glover*, 185 F.3d at 1332 ( court recognized that it must give full effect to all words chosen by Congress and contained in the statute); *but cf. Steadman v. SEC*, 450 U.S. 91,

101 (1981) (where language of statute was "somewhat opaque," Court looked to legislative history to reveal Congress' intent).

In section 6103(a), Congress spoke directly on the precise question of what a forfeiture means: "*all* rights, claims, and benefits under *all* laws administered by the Secretary" are forfeited. (Emphasis added.) By its terms, the statute permits one and only one exception to the emphatic "all . . . all" proscription: a parenthetical set concretely within the statute itself excepts only "laws pertaining to insurance benefits." 38 U.S.C. § 6103(a). That single exception has no bearing upon the matter before us but it does manifest a deliberate choice by Congress to permit only one exception.

Because the statute contains no other exception or qualification, the phrase "all rights, claims, and benefits under all laws administered by the Secretary" necessarily includes "all" title 38 procedural, evidentiary, and substantive rights and benefits afforded to veterans and those eligible family members. Therefore, when an eligible veteran, or an individual eligible by virtue of a relationship with a veteran, forfeits that title 38 eligibility, he or she in fact and in law loses much. Forfeiture results in the loss of the right to have a finally denied claim reopened upon a lower quantum of "new and material evidence" under § 5108); indeed, since § 6103(a) mandates the forfeiture of "all claims," there is no longer an extant claim which could be reopened if, contrary to the clear language of § 6103(a), the benefits of § 5108 remained available after forfeiture. A forfeiture also means the loss of the right to assistance under the Secretary's statutory duty to assist under 38 U.S.C. § 5107(a). *See Laruan, supra*. In addition, forfeiture of "all . . . benefits under all laws administered by the Secretary" means the loss of the enjoyment of the § 5107(b) benefit of the doubt or equipoise standard or proof. Thus, having forfeited the right to the benefit of the doubt standard, one seeking to have a forfeiture revoked would have to shoulder the burden of refuting the factual predicate for the Secretary's original forfeiture decision by a preponderance of the evidence.

In *Villaruz v. Brown,* 7 Vet.App. 561 (1995), where a veteran had forfeited "all rights, claims and benefits" pursuant to 38 U.S.C. § 6103 and sought revocation of the forfeiture pursuant to 38 U.S.C. § 6104, the Court followed without comment the "new and material evidence" reopened claim route of 38 U.S.C. § 5108. However, in *Tulingan v. Brown,* 9 Vet.App. 484, 487 (1996), the Court held that "where a veteran has lost his status as a benefits-eligible claimant, *he must establish*

*it anew by a preponderance of the evidence*." Interestingly, and incorrectly, the authority for this statement was given as *Villaruz*. *Id.* I was a member of the panel which issued *Villaruz* as well as the *Tulingan* panel and thus must plead guilty to the charge of aiding and abetting imprecision.

Upon the reflection generated by this appeal, I have concluded that the Chief Judge was correct and more precise in *Tulingan*: the reopening provisions of 38 U.S.C. § 5108 have no place in the consideration of a request to revoke a forfeiture under § 6103. To the extent that *Villaruz* holds otherwise, it must be reversed (this is the only point in the majority opinion with which I can agree although our reasons differ substantially).

## IV.

Properly framed, the issue presented to the Board was not whether the appellant's claim should be reopened under 38 U.S.C. § 5108 but whether her forfeiture should be revoked. The standard which the Board should have applied was not whether the appellant had submitted new and material evidence to warrant reopening under 38 U.S.C. § 5108 but whether the appellant had submitted evidence of sufficient weight to negate the factual basis for the forfeiture decision and thus gain revocation of that forfeiture.

In seeking revocation of her forfeiture, the appellant has argued that (1) she was forced to marry Mr. Malapitan (R. at 245, 280, 324) and (2) she was never married to Mr. Malapitan on February 26, 1949 and any documents certifying that such a marriage took place were fabricated. R. at 310, 327, 342. 310. She has submitted additional evidence since the 1990 forfeiture in support of her contentions. In its November 14, 1996, decision, the Board determined that this evidence included: (1) the appellant's own written contentions which were duplicative of her assertions before the Board in 1990; (2) a September 1987 statement indicating that a staff member at the office of the civil registry searched the files of the Irosin, Sorsogon civil registry and was unable to find a record of the death of Mr. Malapitan; and (3) a March 1989 statement from the office of the civil registry indicating that the Chief of the Certification Section was unable to find a record showing the marriage of the appellant and Mr. Malapitan.

Although the Board erred in applying the claim-reopening provisions of § 5108 to this § 6103(a) forfeiture, that error was not prejudicial to the appellant (*see* 38 U.S.C. § 7261(b)) because

34

the Board essentially determined that the appellant had failed to contradict the factual predicate upon which her original forfeiture was based by a preponderance of the evidence. *See Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, 117 S. Ct. 1953, 1963 n. 9 (1997) ("[T]he preponderance standard goes to how convincing the evidence in favor of a fact must be in comparison with the evidence against it before that fact may be found."). Specifically, the Board stated:

> *Additional evidence submitted since the May 1990 Board decision either duplicates evidence previously considered or is not probative of the claim* . . . . Since the May 1990 Board decision, the appellant has submitted evidence consisting mostly of her own written contentions [which] duplicate her assertions which were considered by the Board in 1990 . . . . In addition to her written contentions, the appellant has submitted a statement, not previously of record, dated in September 1987, which . . . indicates that a staff member of the office of the civil registry searched the files of the Irosin, Sorsog[o]n Civil Registry and was unable to find a record of the death of the appellant's second husband. She also submitted a statement, not previously of record, dated in March 1989, which . . . indicates that the Chief of the Certification Section was unable to find a record showing the marriage of the appellant and her second husband. As these statements were not of record when the Board made its 1990 decision, they are new evidence. However, *they cannot be considered material since they do not show that the marriage and the death did not take place, merely that the records could not be located at a later date.* As the claims file before the Board in 1990, and today, contains both the marriage certificate and the death certificate in issue, the subsequent loss of such certificates from official records depositories has no probative value on the matter of whether the events reported in the certificates actually occurred. *The newly-submitted statements do not tend to show that the appellant had not previously attempted to conceal her second marriage from the VA; they merely show deficiencies in record-keeping. Thus they are not material for the purposes of reopening the previously-denied claim.*

R. at 5-6. (Emphasis added.)

The evidence of record, including the evidence submitted since the 1990 BVA decision, fails to prove by a preponderance that the basis of the forfeiture decision was incorrect. The appellant has failed to meet her burden of submitting preponderating evidence to warrant revocation of the forfeiture. Therefore, I would affirm the BVA's § 7104(d) order denying benefits.

## V.

The majority opinion goes astray at the very beginning. After paying lip service to the controlling rule that "where a statute has plain meaning, a Court shall give effect to that meaning."

(slip op. at 10; citations omitted), it goes on to hold that "[t]he language of section 6103 plainly states that a person who commits fraud in connection with his or her claim or aware of benefits, loses all rights, claims, and benefits." *Id.* That should be the end of the issue and for me it is; sadly, for the majority, it is not the end but the beginning of an aimless and unwarranted venture through regulations, legislative history, and result-oriented conclusions proffered without reason or rationale. Using only the word "however" as justification, the majority runs the "plain meaning" red light and proceeds to proclaim that there are two "omissions" in the statute. It then uses these "omissions" as licenses to find both ambiguity and absurdity. The first "omission," in the majority's view, is that § 6103(a) is "completely silent on the forfeiture process." *Id.*; slip op. at 11. Why this "omission" is of moment we are not told, but it need only be noted that the statute is completely silent on any number of irrelevancies and for the simple reason that they are just that: irrelevant. The Secretary's decision-making processes are well set out elsewhere and need not be repeated each and every time Congress enacts new legislation affecting benefits. The second "omission" relied upon by the majority is that the statute is "silent on . . . whether Congress intended that a section 6103 bar would forfeit *procedural* rights." *Id.* With regard to this "omission," the majority is factually and simply wrong because the statute is not silent in that regard. Congress used the word "all," as in "shall forfeit *all* rights, claims, and benefits under *all* laws administered by the Secretary." One can only wonder what part of the word "all" the majority does not comprehend. In turning a blind eye to the patent clarity of the statute and using concocted silence to find ambiguity and absurdity, the majority callously disregards the Supreme Court's clear guidance in *Gardner* that "congressional silence 'lacks persuasive significance.'" 513 U.S. at 121.

In its rash rush to overturn this Court's decisions in *Villeza v. Brown*, 9 Vet.App. 353 (1996), and *Tulingan*, the majority holds that those decisions did not give proper deference to regulations promulgated by the Secretary. Yet, as a simple reading will confirm, in none--not one--of the regulations cited by the majority has the Secretary promulgated rules allowing for the reopening of final forfeitures. *See* 38 C.F.R. §§ 3.104, 3.105, 3.905(d), 20.1103, 20.1104. Thus, the majority requires post hoc deference to regulations which do not even deal with the issue before the Court in those cases. Of even more import, in its thrashing about for some at least colorable authority for its conclusion that the procedural benefits of 38 U.S.C. § 5108 are not forfeited under § 6103, the

36

majority trumpets the historical fact that these irrelevant regulations have remained unchanged since the 1960's when they were first promulgated. So what? When that argument was made in *Gardner,* the Supreme Court summarily rejected it: "A regulation's age is no antidote to clear inconsistency with a statute, and the fact, again, that [the VA regulation] flies against the plain language of the statutory text exempts courts from any obligation to defer to it." 513 U.S. at 122. In sum, the majority's regulatory analysis suffers from the same defects as its statutory analysis in that it is simply irrelevant and ignores settled Supreme Court precedent and canons of statutory construction.

Finally, and contrary to the suggestion of the majority, there indeed are procedures available for "revisiting" an initial forfeiture decision. The forfeitee can seek appellate review by the Board pursuant to 38 U.S.C. § 7104(a) and then, if he or she chooses, by this Court by filing a Notice of Appeal. *See* 38 U.S.C. § 7252. Moreover, although the majority again suggests otherwise, even without the benefit of the liberal reopening provisions of 38 U.S.C. § 5108, a forfeitee is not without remedy. He or she can seek to have lost title 38 benefits, rights, and claims restored by having the forfeiture revoked but, because of the loss of status as a benefits-eligible claimant by virtue of the forfeiture, status as a benefits-eligible claimant would have to be established by a preponderance of the evidence. *See Laruan, supra*. Through the RO, the Secretary would still be authorized and required to adjudicate the threshold issue of status to first ensure that the Secretary has the authority to adjudicate the merits. 38 U.S.C. § 511(a) ("The Secretary shall decide all questions of law and fact necessary to a decision by the Secretary under a law that affects the provisions of benefits by the Secretary to veterans or the dependents or survivors of veterans."); c*f. Barnett v. Brown*, 83 F.3d 1380, 1383 (Fed. Cir. 1996) ("[I]t is well-established judicial doctrine that any statutory tribunal must ensure that it has jurisdiction over each case before adjudicating the merits, that a potential jurisdictional defect may be raised by the court or tribunal, sua sponte or by any party at any stage in the proceedings, and, once apparent, must be adjudicated."); *Phillips v.* Brown, 10 Vet.App. 25, 30 (1997) ("[I]t is . . . well established that a court has jurisdiction to determine whether it has jurisdiction over a particular matter.") (citing *Bell v. Hood*, 327 U.S. 678 (1946)). If the forfeitee fails to meet the burden of submitting preponderating evidence to show that the factual basis for the forfeiture decision was wrong, the RO will decide not to revoke the forfeiture; that decision may be appealed to the BVA (38 U.S.C. § 7104(a)) and then to this Court. 38 U.S.C. § 7252. Of course,

37

if there is no evidence submitted, then administrative res judicata would apply. *See Astoria Federal Savings & Loan Ass'n v. Solimino* 501, U.S. 104, 107 (1991) (citing *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422 (1966), the Court stated, "[W]hen an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an opportunity to litigate, the Courts have not hesitated to apply res judicata to enforce repose."); *Routen v. West*, 142 F.3d 1434 (Fed. Cir. 1998) (basic principles of finality and res judicata apply to agency decisions denying a veteran's claim for disability benefits). On the other hand, if the RO decides that status was established (or re-established) by a preponderance of the evidence, then, and only then, can the RO look to the merits and determine whether benefits should be restored or awarded.

In its opinion, the majority concedes that the language of § 6103 is "plainly" stated, but it characterizes the result compelled by that language as "absurd" when it is not. The majority's tortured effort to escape that mandate rests on the incorrect predicate of the absurdity they conjure. For reasons neither explained nor explainable, the majority has chosen to ignore well-settled legal principles in order to give away rights and benefits to which only veterans are entitled, including the right to reopen a finally-denied claim under 38 U.S.C. § 5108, to one who has forfeited her entitlement to such veterans' rights and benefits. I dissent.

NEBEKER: *Chief Judge,* dissenting: I join Judge Farley's well-tempered and clear dissent. The majority remands to "the Secretary and the Board" (but for our purposes they are, of course, one) ". . . to address in the first instance what evidence is required for Mrs. Trilles to reopen the VA-benefits-eligibility forfeiture . . . ." *Ante* at ___, slip op. at 19. Obviously under the strained construct by the majority that evidence must be new and material. Indeed that is what "We [the majority] hold . . . ." *Ante* at ___, slip op. at 16-17. I ask what else can it be but evidence tending to negate the established fraud. The sad aspect of the Court's holding is that one who fraudulently got benefits is, like honest veterans, treated with the soft gloves of VA process. Now Mrs. Trilles does not have to present anything more than what the indulgent *Hodge* standard requires to get "review [of] the former disposition of the claims." 38 U.S.C. § 5108; *Hodge v. West*, 155 F.3d 1356

(Fed. Cir. 1998). Whether that is "readjudication" as the majority mandates is left imprecisely to the Board.

I add the following in the hope that the majority's holding can be ameliorated by considering what it has done to the VA process reserved for those presumed to be honest. As Judge Farley states, the majority relies on VA regulations and process to apply a reopening standard of new and material evidence to this case. However, the clarity of the law as stated in his dissent ought to persuade the Secretary to change that way of treating forfeiture revocation efforts. This can be done even under the majority opinion. In fairness to the many who have served and qualify for title 38 benefits, those who have cheated that system should remain outcasts until, and if, they show their forfeiture was in error through the usual adversarial process and not the indulgent VA process reserved for claimants untainted by fraud. Indeed, Judge Kramer's separate opinion embraces the wisdom of a policy of non-indulgent process for those malefactors. One is left to wonder whether, under the majority holding, a person found to have committed treason (38 U.S.C. § 6104) or to have been indicted or convicted for certain crimes involving national security (38 U.S.C. § 6105) may likewise use the claimant-friendly VA process to attack the forfeiture resulting from such conduct.

APPENDIX

TITLE 38, CODE OF FEDERAL REGULATIONS

**§ 3.900 General.**

(a) Forfeiture of benefits based on one period of service does not affect entitlement to benefits based on a period of service beginning after the offense causing the prior forfeiture.

(b) (1) Except as provided in paragraph (b)(2) of this section, any offense committed prior to January 1, 1959, may cause a forfeiture and any forfeiture in effect prior to January 1, 1959, will continue to be a bar on and after January 1, 1959.

(2) Effective September 2, 1959, forfeiture of benefits may not be declared except under the circumstances set forth in § 3.901(d), § 3.902(d), or § 3.903. Forfeitures declared before September 2, 1959, will continue to be a bar on and after that date.

(c) Pension or compensation payments are not subject to forfeiture because of violation of hospital rules.

(d) When the person primarily entitled has forfeited his or her rights by reason of fraud or a treasonable act determination as to the rights of any dependents of record to benefits under § 3.901(c) or § 3.902(c) may be made upon receipt of an application.

**§ 3.901 Fraud.**

(a) *Definition.* An act committed when a person knowingly makes or causes to be made or conspires, combines, aids, or assists in, agrees to, arranges for, or in any way procures the making or presentation of a false or fraudulent affidavit, declaration, certificate, statement, voucher, or paper, concerning any claim for benefits under any of the laws administered by the Department of Veterans Affairs (except laws relating to insurance benefits).

(b) *Effect on claim.* For the purposes of paragraph (d) of this section, any person who commits fraud forfeits all rights to benefits under all laws administered by the Department of Veterans Affairs other than laws relating to insurance benefits.

(c) *Forfeiture before September 2, 1959.* Where forfeiture for fraud was declared before September 2, 1959, in the case of a veteran entitled to disability compensation, the compensation payable except for the forfeiture may be paid to the veterans' spouse, children and parents provided the decision to apportion was authorized prior to September 2, 1959. The total amount payable will be the lesser of these amounts:

(1) Service-connected death benefit payable.

(2) Amount of compensation payable but for the forfeiture.

No benefits are payable to any person who participated in the fraud causing the forfeiture.

(d) *Forfeiture after September 1, 1959.* After September 1, 1959, forfeiture by reason of fraud may be declared only

1

(1) Where the person was not residing or domiciled in a State as defined in § 3.1(i) at the time of commission of the fraudulent act; or

(2) Where the person ceased to be a resident of or domiciled in a State as defined in § 3.1(i) before expiration of the period during which criminal prosecution could be instituted; or

(3) The fraudulent act was committed in the Philippine Islands.

Where the veteran's rights have been forfeited, no part of his or her benefit may be paid to his or her dependents.

(e) *Remission of forfeitures imposed prior to September 2, 1959.* Where it is determined that a forfeiture for fraud which was imposed prior to September 2, 1959, would not be imposed under the law and regulation in effect on and after September 2, 1959, the forfeiture shall be remitted effective June 30, 1972. Benefits to which a person becomes eligible by virtue of the remission, upon application therefor, shall be awarded effective as provided by § 3.114

## § 3.902 Treasonable acts.

. . . .

## § 3.903 Subversive activities.

. . . .

## § 3.904 Effect of forfeiture after veteran's death.

(a) *Fraud.* Whenever a veteran has forfeited his or her right by reason of fraud, his or her surviving dependents upon proper application may be paid pension, compensation, or dependency and indemnity compensation, if otherwise eligible. No benefits are payable to any person who participated in the fraud causing the forfeiture.

(b) *Treasonable acts. . . .*

(c) *Subversive activities. . . .*

## § 3.905 Declaration of forfeiture or remission of forfeiture.

(a) *Jurisdiction.* At the regional office level, except in VA Regional Office, Manila, Philippines, the Regional Counsel is authorized to determine whether the evidence warrants formal consideration as to forfeiture. In the Manila Regional Office the Adjudication Officer is authorized to make this determination. Submissions may also be made by the director of a service, the Chairman, Board of Veterans Appeals, and the General Counsel. Jurisdiction to determine whether the claimant or payee has forfeited the right to gratuitous benefits or to remit a prior forfeiture is vested in the Director, Compensation and Pension Service, and personnel to whom authority has been delegated under the provisions of § 3.100(c).

(b) *Fraud or treasonable acts.* Forfeiture of benefits under § 3.901 or § 3.902 will not be declared until the person has been notified by the Regional Counsel or, in VA Regional Office, Manila, Philippines, the Adjudication Officer,

2

of the right to present a defense. Such notice shall consist of a written statement sent to the person's latest address of record setting forth the following:

(1)  The specific charges against the person;

(2)  A detailed statement of the evidence supporting the charges, subject to regulatory limitations on disclosure of information;

(3)  Citation and discussion of the applicable statute;

(4)  The right to submit a statement or evidence within 60 days, either to rebut the charges or to explain the person's position;

(5)  The right to a hearing within 60 days, with representation by counsel of the person's own choosing, that fees for the representation are limited in accordance with 38 U.S.C. § 5904(c) and that no expenses incurred by a claimant, counsel or witness will be paid by VA.

(c)  *Subversive activities*.  Automatic forfeiture of benefits under § 3.903 will be effectuated by an official authorized to declare a forfeiture as provided in paragraph (a) of this section.

(d)  *Finality of decisions*.  A decision of forfeiture is subject to the provisions of § 3.104(a) and § 20.1103 and § 20.1104 of this chapter.  The officials authorized to file administrative appeals and the time limit for filing such appeals are set forth in § 19.51 of this chapter.

(e)  *Remission of forfeiture*.  In event of remission of forfeiture under § 3.901(e), any amounts paid as an apportionment(s) during periods of the previously forfeited beneficiary's reentitlement will be offset.

38 C.F.R. §§ 3.900 through 3.905 (1998).  *See* 27 Fed. Reg. 8590-91 (1962); 28 Fed. Reg. 2234 (1963).